**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| **JAYDA CHAMPION HILL,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 1:15-cv-02151-KOB** |
| | ) | |
| **BRANCH BANKING AND TRUST** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

Plaintiff Jayda Champion Hill sued her former employer, Defendant Branch Banking and Trust Company, alleging that the Bank had discriminated against her on the basis of a disability, failed to provide reasonable accommodation for her disability, interfered with her FMLA rights, retaliated against her for requesting accommodation for her disability and exercising her FMLA rights, and for state law claims of invasion of privacy and intentional infliction of emotional distress. (Doc. 1). BB&T moved for summary judgment on all of Ms. Hill's claims. (Doc. 23). As discussed in this opinion, the court will grant in part the motion as to the ADA discrimination, ADA failure to accommodate, invasion of privacy, and intentional infliction of emotional distress claims, but deny in part as to the FMLA interference and retaliation claims.

## I.    BACKGROUND

### A.    BB&T's Oxford Branch

BB&T hired Ms. Hill as a "Branch Banker III" in the Oxford branch. Ms. Hill reported to Sharon Brooks, Teller Supervisor, and Melissa Craven, Market Leader. Allie Norred was the senior teller at the branch.

## B.  Ms. Hill's FMLA Leave

On Wednesday, September 24, 2014, Ms. Hill had surgery to remove her gallbladder. Ms. Hill requested, and BB&T approved, FMLA leave from the date of the surgery until October 5, 2014. Ms. Hill testified that Ms. Brooks pressured her into returning to work on October 6 and that her doctor had originally told her she should take somewhere between three and six weeks off. Ms. Hill says she asked for less leave time because of Ms. Brooks' pressure.

Ms. Hill claims that when she informed Ms. Brooks she would need surgery the next day to remove her gallbladder, Ms. Brooks said employees at the bank who had gallbladder surgery were typically out less than a week, and that she should return to work on Monday. When Monday came, Ms. Hill felt too sick to work. She called Ms. Brooks to tell her she could not work that day. Ms. Hill says that Ms. Brooks sounded "angry," but told her it was fine and to come in the following day.  Ms. Hill still was not feeling well the next day and again called Ms. Brooks, who told her to just take the whole week off.

On Thursday, October 2, BB&T sent Ms. Hill the FMLA leave paperwork, listing October 6 as the date Ms. Hill would return to work. Ms. Hill informed her doctor that BB&T needed her back on the date, and he approved the request. On that same date, Ms. Brooks sent Ms. Hill a text message asking when Ms. Hill was returning to the doctor and when she would be released because she needed the information to create a work schedule for the next week. Ms. Hill responded that she would be going on October 16, to which Ms. Brooks said, "Your [sic] not coming back till the 16?" Ms. Hill did not respond to that question. The next day, Ms. Hill texted Ms. Brooks to ask if she had received her release papers. Ms. Brooks said she had not received them yet. Ms. Hill ultimately returned to work on October 6.

After Ms. Hill's gallbladder surgery, she suffered from diarrhea for approximately nine months. At her deposition on August 26, 2016, Ms. Hill said she did not consider herself disabled at that time and believed she was able to work. Ms. Hill's doctor testified that her post-operative condition limited her ability to control her bowels and substantially affected her ability to work, walk, sit, or eat, without easy access to a bathroom.

Ms. Hill testified that when she returned to work, she gave Ms. Brooks a note from her doctor indicating that she would need to use the bathroom more frequently as a result of her surgery; Ms. Hill also asked *not* to be assigned to drive-through. Ms. Brooks does not remember any conversations with Ms. Hill regarding her need for more frequent bathroom visits and does not recall her complaining about it. However, Ms. Hill says she told her coworkers and Ms. Craven when she returned to work that she would require increased bathroom visits.

The Oxford branch of BB&T has a drive-through window. The teller working the drive-through window is separated from the other teller windows. A restroom is located a few seconds walk from the drive-through window.

Kim Robertson was in charge of making the work schedule for the branch, including determining which tellers would work the drive-through window. In her role as Teller Supervisor, Ms. Brooks said she would pass the schedules out but did not have authority to make any changes to the document. However, other employees testified that Ms. Brooks had the authority to assign a teller to work the drive-through window and that, regardless of what the schedule may say, she could assign an employee to that station. Ms. Hill testified that even when the schedule said she was to work in the lobby, Ms. Brooks would tell her there had been a "change of plans" and tell her to work the drive-through.

Ms. Norred said she personally did not enjoy working the drive-through. Some employees enjoyed working the drive-through less than the lobby. Ms. Hill testified that the schedule would force her to work the drive-through for six to seven hours at a time, and required her to work an hour and a half more than the lobby tellers. Ms. Hill claims that she lost the opportunity to receive $100-$150 biweekly in bonuses by being scheduled to work in the drive-through so much. BB&T had an incentive program that rewarded employees for selling financial products to customers. Customers going through the drive-through would not be completing the sort of transactions where a teller could "upsell." However, Ms. Hill admits that she was not sure if she was reaching her incentive goal prior to her leave, and that if she was hitting her bonus targets, it was only when two other tellers were out.

Before taking FMLA leave, Ms. Hill worked the drive-through every Tuesday. After returning from her surgery, Ms. Hill says she was assigned to work almost exclusively in the drive-through and was tasked to that position more frequently than other tellers. Ms. Brooks and Ms. Reynold both testified it would not be unusual for a teller to work the drive-through for a full week and Ms. Reynolds said she did not recall Ms. Hill working the drive-through more frequently than other tellers.

If a teller working the drive-through needed to go to the restroom, she was supposed to call or message the main lobby to find a teller to cover for her. If all of the tellers were busy with clients, the tellers were instructed to finish serving their current client before moving to relieve the teller in the drive-through. Ms. Craven had also informed employees that platform-side employees (those not working the "front desk" of the bank) were also available to relieve a teller in the drive-through.

The parties dispute whether BB&T had a policy prohibiting a teller from leaving the drive-through unattended. Ms. Brooks testified BB&T did not have an official policy but that the procedure was out of general respect for clients. Although disciplinary action would not be taken against the employee, Ms. Brooks said that a teller who left the drive-through unattended would be coached not to do so, and that she had conversations with every employee at the Oxford branch, including Ms. Hill, about the importance of ensuring the drive-through was attended. Ms. Reynolds testified that Ms. Craven did not like the drive-through left unattended, but on occasions she "just had to" if she was not able to get another teller to cover for her while she was working the drive-through. Ms. Hill says Ms. Craven had "verbally disciplined" her for leaving the drive-through unattended and so she feared to do so again.

On two occasions while working the drive-through, Ms. Hill could not find anyone to relieve her, and left the drive-through unattended while going to the bathroom. BB&T did not discipline Ms. Hill. Ms. Hill observed that the tellers in the lobby were not helping customers at the time when she needed relief, and says she had to wait an average of 20 to 30 minutes for another teller to relieve her. Ms. Reynolds testified she never had an issue with tellers delaying relieving her. Ms. Hill testified that she experienced severe cramps when she delayed using the restroom and that she had to leave work early one day after she soiled her pants because on an episode of uncontrollable diarrhea.

Ms. Hill never called BB&T's hotline or human resources department to complain about not being able to obtain coverage to use the restroom while working the drive-through. Ms. Hill complained to Ms. Craven about her position at least once a week, but Ms. Craven just referred her to Ms. Brooks. Ms. Brooks testified that an employee with complaints could bring them to her, or if the employee felt that she could not go to her, to Ms. Craven. On one occasion, Ms. Hill

asked a supervisor for the number of BB&T's ethics hotline so that she could complain, but it was not given to her and she could not locate it in the employee handbook.

On October 26, 2014, Belinda Reynolds' son passed away. She requested not to be assigned to work the drive-through window for a few days because she wanted to be around other people. BB&T says any increase in Ms. Hill being scheduled to work the drive-through was because of Ms. Reynolds' request. After her son passed away, Ms. Reynolds committed several errors and received disciplinary action, including a final written warning. She was then transferred to a smaller, less busy branch.

Ms. Hill complained about the work environment of the bank, comparing it to the movie *Mean Girls* and claiming that Ms. Brooks and Ms. Norred ridiculed her and gossiped about her in an effort to make her quit. Ms. Hill claims Ms. Brooks talked about her condition to BB&T employees in other branches and also told them Ms. Hill had talked to her in a disrespectful manner when she requested an accommodation. Ms. Hill felt that when she would walk into a room, people would sneer at her.

C.     ICE Exception

Pearlie Dunson, BB&T's Area Operations Officer, conducts random audits of BB&T branches and provides internal control exceptions (known as "ICE exceptions) to employees who commit errors. ICE exceptions do not result in written discipline, suspension, or pay reduction. Ms. Reynolds testified that an ICE exception was given when an employee committed a "big no-no" and that it "probably" counted against an employee in a performance evaluation. However, Ms. Reynolds also said she considered an ICE exception to be a learning opportunity more than a form of discipline.

Ms. Dunson issued Ms. Hill an ICE exception for not properly completing a "Commercial Deposit Bag Delivered Over the Counter" form. When filling out the form, Ms. Hill omitted the branch location, the center number, the date, and the time received for the deposit. Ms. Norred completed a "Nightly Deposit Daily Checklist," which indicated that the commercial deposit bag form completed by Ms. Hill was correctly filled out. Ms. Dunson testified that she did not issue Ms. Norred an ICE exception because her random audit had only called for an audit of the form Ms. Hill filled out and not the one Ms. Norred completed.

### D. Promotion

Either in late November or early December 2014, BB&T hired Nancy Lopez to replace a branch banker who was leaving. Ms. Hill had assumed she would receive a promotion to that position, as she had completed all the requisite training for the position and Ms. Craven had informed her she would be given the position when the bank hired more tellers.

Ms. Lopez is bilingual, and BB&T claims that its Oxford branch is required to have a bilingual employee. In April 2014, BB&T replaced the previous bilingual Oxford employee with Ms. Hill, who is not bilingual. BB&T never inquired whether Ms. Hill was bilingual. Ms. Hill also says that Spanish-speaking customers rarely did business in the Oxford branch, and that BB&T offered a phone number customers needing a translator could call.

Ms. Craven took down the name plaques on a wall in the bank listing the branch bankers. Ms. Hill says her and another teller's plaques were removed, while Ms. Craven's and Ms. Brooks' names remained on the wall.

### E. Black Friday and "Force Balancing"

BB&T has a policy against "force balancing." Force balancing occurs when a teller reports a zero balance for a drawer knowing the drawer is out of balance.

BB&T policy requires that a teller "show any cash difference on the same day in which the difference occurs." The policy instructs tellers to follow specific procedures when they find their drawers out-of-balance. If the difference is $25.00 or less, the teller is just supposed to record the discrepancy on her general ledger. The policy also provides that a teller should report a difference in her drawer of more than $1,000 within three days.

Ms. Hill, having reviewed these policies, was aware that she was supposed to record any discrepancies she found while balancing her drawer. On the day after Thanksgiving, "Black Friday," November 28, 2014, Ms. Hill was working the drive-through window. After a long and hectic day, she was tired and wanted to go home. When Ms. Hill went to balance her drawer, she found that she had an overage—she had more money in her drawer than the ledger said she should have had. Ms. Hill believed the overage was the result of her and Ms. Reynolds swapping money earlier in the day.

Ms. Hill called Ms. Norred, and she says Ms. Norred told her that Ms. Reynolds would come and get $20 from her drawer to correct the imbalance. Ms. Hill acknowledges that she should have posted her overage rather than taking money out of her drawer to put in Ms. Reynolds' drawer to correct the imbalance. However, Ms. Hill says she was acting on Ms. Norred's instructions when she did not post the overage.

The parties dispute whether Ms. Norred had supervisory authority over Ms. Hill. What is undisputed is that Ms. Norred was the senior teller on duty on Black Friday. Ms. Norred first testified that Ms. Craven was not present on that day, but later testified that she was working. Regardless, Ms. Norred did not report the out-of-balance incident to Ms. Craven on that day, despite knowing that she should have done so.

On December 1, 2014, the following Monday, Ms. Norred did inform Ms. Craven that Ms. Hill may have force balanced on Black Friday. Ms. Craven asked Ms. Dunson to perform an audit of Ms. Hill's drawer. Ms. Dunson and Ms. Brooks counted Ms. Hill's drawer and determined there was a $25 overage, and that because the posted amount did not match the amount in the drawer, Ms. Hill had force balanced. Ms. Dunson also filed a suspicious incident report.

On December 9, 2014, Senior Corporate Investigator Joe Rowe investigated the incident. As part of the inquiry, Ms. Hill wrote a statement admitting that she had given money from her drawer to Ms. Reynolds and that she force balanced. Ms. Hill says that Mr. Rowe "made me sign a paper saying I force balanced." Mr. Rowe prepared a report on his investigation.

Angie Parker, Regional Associate Relations Manager, reviewed Mr. Rowe's report. Ms. Parker notified Leah Junkins, Retail Banking Manager, that a significant violation of BB&T policy had occurred. Force balancing is grounds for immediate termination. Ms. Dunson testified that BB&T had terminated a teller at another branch after discovering that her drawer contained *less money* than reported.

Based on Ms. Hill's statement, Ms. Parker concluded that Ms. Hill intentionally force balanced her drawer when it had an overage. BB&T terminated Ms. Hill's employment on December 11, 2014.

F.      **Other Policy Violations**

Other employees at the Oxford branch violated BB&T's policies and were not terminated. Mark Reynolds, a teller, cashed a fraudulent check. Ms. Reynolds testified, "If it can be done wrong, I've done it it seems like." Ms. Brooks violated BB&T's cash swapping policy and shared confidential information.

## II.     STANDARD OF REVIEW

Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. When a district court reviews a motion for summary judgment, it must determine two things: whether any genuine issues of material fact exist, and whether the moving party is entitled to judgment as a matter of law. *Id.*

The court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the non-moving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court must not weigh the evidence and making credibility determinations because these decisions belong to a jury. *See id.* at 254.

Further, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *See Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). However, the nonmoving party "need not be given the benefit of every inference but only of every *reasonable* inference." *Id.* (emphasis added).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

After both parties have addressed the motion for summary judgment, the court must grant the motion *only if* no genuine issues of material fact exist *and* the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56.

## III.     DISCUSSION

### A.     ADA Disparate Treatment

To establish a prima facie case of discrimination under the ADA, Ms. Hill must show that she "(1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of [her] disability." *Greenberg v. BellSouth Telecommunications, Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000)). BB&T does not contest that Ms. Hill is a qualified individual but argues that Ms. Hill did not suffer from a condition that qualifies as a disability under the ADA and, further, that even if she was disabled, BB&T did not discriminate against her based on that disability.

### 1.    *Ms. Hill's Disability*

BB&T argues that Ms. Hill's "diarrhea was neither severe nor permanent enough to constitute a disability" and that she even admitted "in her deposition that she is not disabled." (Doc. 24 at 14). A person is considered disabled under the ADA when she has "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). "Major life activities" include major bodily functions, such as bowel functions. 42 U.S.C. § 12102(2)(B).

The ADA, as amended in 2008, instructs that "[t]he definition of disability in this chapter shall be construed in favor of *broad coverage* of individuals under this chapter." 42 U.S.C. § 12102(4)(A) (emphasis added); *see also* 29 C.F.R. § 1630.1(c)(4) ("The primary purpose of the ADAAA is to make it easier for people with disabilities to obtain protection under the ADA."); *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014) ("When it enacted the ADAAA, Congress indicated that one of its purposes was to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis.") (internal quotation omitted).

BB&T contends that Ms. Hill "has not presented any evidence demonstrating that her temporary diarrhea substantially limited her in any major life activities." (Doc. 24 at 15). The

court disagrees. The record reflects that Ms. Hill's condition limited her in the performance of her duties at work by requiring her to take frequent restroom breaks. Bowel control is a major bodily function, which makes it a major life activity under the statute.

BB&T also argues that the temporary nature of Ms. Hill's condition means that she should not be considered disabled under the ADA. Before the 2008 amendments to the ADA, courts routinely found a plaintiff was not disabled if her condition was not expected to cause a permanent effect on her ability to perform major life activities. However, after the 2008 amendments, that is no longer the case: a temporary impairment *may* qualify as a disability. *See Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 333 (4th Cir. 2014) ("Under the ADAAA and its implementing regulations, an impairment is not categorically excluded from being a disability simply because it is temporary."). Now the length of the impairment is but *one factor* that a court considers in determining whether a plaintiff has a disability. *See* 29 C.F.R. § Pt. 1630, App. ("the duration of an impairment is one factor that is relevant in determining whether the impairment substantially limits a major life activity") (internal citation omitted).

The non-controlling authority cited by BB&T is inapposite or unpersuasive because it predates the 2008 amendments, misapplies the law in light of the amendments, or is factually distinct from this case. For example, the court in *Deeds v. State Farm Mut. Auto. Ins. Co*., No. CIV.A. 10-142, 2012 WL 1150755 (M.D. La. Apr. 5, 2012), did not consider the 2008 amendments to the ADA. The district court concluded "the summary judgment record, even read in Plaintiff's favor, establishes only that Plaintiff had episodic, intermittent diarrhea as a result of her IBS." *Id*. at 6. However, the ADA now specifically provides that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D). Given the plain text of the amended statute, the Louisiana

district court's conclusion that a plaintiff was not disabled under the ADAAA because her condition was episodic is unpersuasive.

Similarly, the Texas district court in *Anyadike v. Vernon Coll.*, No. 7:15-CV-00157-O, 2016 WL 7839183 (N.D. Tex. Mar. 14, 2016), based its analysis on the previous version of the statute and superseded regulations, concluding that the plaintiff failed to state a claim because the complaint did not allege a "permanent or expected long-term impact on substantially limiting a major life activity." *Id*. at 10. The district court's conclusion directly conflicts with the amended statute, which allows for an episodic condition to constitute a disability. Likewise, *Reynolds v. Ocean Bio Chem/Kinpak, Inc*., No. 2:12-CV-1101-MEF-TFM, 2014 WL 495354 (M.D. Ala. Feb. 5, 2014), is unpersuasive for the same reason.

*Lewis v. Florida Default Law Grp*., P.L., No. 8:10-CV-1182-T-27EAJ, 2011 WL 4527456 (M.D. Fla. Sept. 16, 2011), is distinguishable on its facts. In *Lewis*, the district court held that a plaintiff's symptoms from the H1N1 virus did not constitute a disability because he had not shown that the temporary impairments substantially limited any major life activity. *See id*. at *5. In fact, when the plaintiff returned to work, he was no longer suffering from the virus and required no accommodation. *See id.* at *5 n.20. In contrast, Ms. Hill's condition *did* continue after her return to work and affected a major life activity while at work.

*Wedel v. Petco Animal Supplies Stores, Inc*., No. 13-CV-2298, 2015 WL 859072 (D. Kan. Feb. 27, 2015), is distinguishable because in that case there was "no evidence in the record that plaintiff's condition even on occasion prevented plaintiff from controlling her bowels." *Id*. at *3. The district court's holding was that the mere request for additional bathroom breaks did not evidence a problem controlling one's bowels. *See id*. Here, however, Ms. Hill's physician testified that her condition limited her ability to control her bowels.

In *May v. AT & T Corp.*, No. 2:11-CV-01923-TMP, 2013 WL 3357005, the court cited

*Garrett v. University of Alabama at Birmingham Board of Trustees*, 507 F.3d 1306, 1311 (11th

Cir. 2007) to establish that a temporary impairment does not constitute a disability. But, as other

courts of acknowledged, *Garrett*'s analysis is of dubious value after the 2008 amendments. *See*

*Moore v. Jackson Cty. Bd. of Educ.*, 979 F. Supp. 2d 1251, 1259 (N.D. Ala. 2013) ("*Garrett* no

longer applies in light of the ADA Amendments Act of 2008").

 The one piece of binding authority cited by BB&T, *Sutton v. Lader*, 185 F.3d 1203 (11th

Cir. 1999), is distinguishable both as a matter of law and fact. BB&T relies on the *Sutton* Court's

assertion that "[a] temporary inability to work while recuperating from surgery is not such a

permanent or long-term impairment and does not constitute evidence of a disability covered by

the Act." *Id*. at 1209. However, the Eleventh Circuit made that statement in the context of

interpreting a statute and regulations that have since been superseded by an amended statute

designed to broaden the definition of disability. *See id.* (citing "the permanent or long term

impact, or the expected permanent or long term impact of or resulting from the impairment" as a

factor). Further, the proposition from *Sutton* does not apply to this case. Unlike the plaintiff in

*Sutton*, Ms. Hill is not claiming she was disabled because BB&T did not permit her to work

while recovering from surgery.  Rather, Ms. Hill's claim is that the surgery instigated a disabling

condition.

 Based on the record at summary judgment, the court finds that Ms. Hill has presented at

least a triable issue of fact as to whether her uncontrollable diarrhea substantially limited her

ability to control her bowels, a major bodily function and consequently a major life activity so as

to qualify as a disability under the ADA.

 2. *Discrimination on the Basis of the Disability*

The ADA prohibits employers from discriminating against disabled employees with regard to "hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). BB&T first argues that Ms. Hill has failed "to demonstrate that she was subjected to an 'adverse action' that resulted in a material alteration in the terms of her employment." (Doc. 24 at 16). Ms. Hill identifies several actions she believes fall within the orbit of § 12112(a): her termination, disproportionally scheduling Ms. Hill to work the drive-through, excluding her from equal jobs, and failing to investigate and correct the hostile work environment Ms. Hill faced based on her disability. The court will consider each of these theories in turn, determining if the activity falls within § 12112(a) and whether a genuine issue of material fact exists concerning BB&T's motive for the action.

<em>a.</em>    <em>Adverse Employment Actions</em>

The ADA proscribes "a broad variety of adverse employment actions, whenever those actions are taken for a prohibited reason." *McNely v. Ocala Star–Banner Corp.*, 99 F.3d 1068, 1077 (11th Cir.1996). However, not every "unkind act" is an adverse action. *See Wu v. Thomas*, 996 F.2d 271, 274 n.3 (11th Cir. 1993). Adversity is judged from an objective perspective; the question is whether "a reasonable person in his position would view the employment action in question as adverse." *Doe v. Dekalb Cty. Sch. Dist.*, 145 F.3d 1441, 1449 (11th Cir. 1998).

Unquestionably, Ms. Hill's termination was an adverse employment action. *See Felder v. Bradford Health Servs.*, 493 F. App'x 17, 21 (11th Cir. 2012). Similarly, failure to promote an employee is also an adverse action. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) ("In the context of this case, a tangible employment action would have taken the form of

a denial of a raise or a promotion."). Therefore, with respect to these theories, the only question is whether Ms. Hill can demonstrate a causal link between the action and her disability.

Equally clear is that BB&T's issuing Ms. Hill an ICE exception and removing her name from a plaque on the wall are not adverse actions. Ms. Hill has presented no evidence that a reasonable person would have regarded the removal of the plaque as an adverse action. Removing the plaque did not affect the terms or conditions of Ms. Hill's employment. Therefore, it cannot be an adverse act.

Given the facts in the record, the ICE exception is not an adverse action either. An ICE exception is not formal discipline; even the employee who felt that it factored into performance evaluations believed it was more an educational tool than a form of discipline. Moreover, negative evaluations are only adverse actions when a link can be shown between the review and an alteration of the terms of employment. *See Smiley v. Jekyll Island State Park Auth.*, 12 F. Supp. 2d 1377, 1382 (S.D. Ga. 1998). Ms. Hill does not claim that her ICE exception resulted in any change of job duties or conditions. Therefore, the ICE exception does not qualify as an adverse action.

Ms. Hill's claim that being scheduled to work the drive-through more often than before she took leave constitutes an adverse employment action is a closer call. The question turns on whether Ms. Hill's assignments after taking leave were a major change in her position. *See Johnson v. NF Chipola LLC*, No. 5:14-CV-119-RS-GRJ, 2014 WL 6685523, at *3 (N.D. Fla. Nov. 26, 2014) ("[T]he minor changes to hours and schedule do not rise to the level of substantiality required to constitute an adverse employment action."). Ms. Hill argues that BB&T limited and segregated her to the drive-through window in violation of § 12112(b)(1), which prohibits an employer from discriminating against an employee on the basis of a disability by

"limiting, segregating, or classifying" the employee "in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee."

Mere isolation is insufficient to establish adversity. *See Robinson v. Purcell Const. Corp.,* 859 F. Supp. 2d 245, 256 (N.D.N.Y. 2012) (finding plaintiff's complaint that she was assigned duties that made her feel "isolated and ostracized" not to constitute a material change in the terms or conditions of employment). Therefore, the drive-through's location alone does not mean that assignment to that position constitutes an adverse action.

Typically, material changes in employment have an economic effect on the plaintiff. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998) ("A tangible employment action in most cases inflicts direct economic harm."). Ms. Hill claims she lost the opportunity to earn up to $150 in biweekly bonuses as a result of being assigned to work the drive-through more frequently than she had in the past. BB&T suggests this assignment is not an adverse action because Ms. Hill was not hitting her targets to receive the bonuses before her surgery and leave.

This close question turns on whether a reasonable person in Ms. Hill's position would view the loss of the opportunity to earn bonuses as an adverse action because it decreased her earning potential. Ms. Hill was still learning how to effectively meet her quotas. Given that fact, the court finds that a reasonable person could view increased assignments to the drive-through as an adverse action because it would decrease Ms. Hill's opportunity to earn biweekly bonuses. Simply because a person had not earned bonuses in the past does not mean that person would not consider the removal of the opportunity to earn bonuses in the future as an adverse action.

Of course, this analysis is predicated on the fact that Ms. Hill was assigned to the drive-through more than her co-workers after she returned from her surgery. The parties dispute this fact.

Ms. Hill testified she was disproportionally assigned to the drive-through, but other employees testified they did not recall her working there more than anyone else. In its reply brief, BB&T attached the entire work schedule for 2014, noting that other employees were assigned verbally by Ms. Brooks

to work the drive-through and that Ms. Hill did not work the drive-through during the pertinent timeframe more than any other employee. However, BB&T did not calculate whether Ms. Hill was assigned to work the drive-through more than other employees, but merely attached the written schedule and asserted that was the case without providing data supporting that proposition. Fortunately, the court does not need to undertake the tedious task of making those calculations. When viewed in the light most favorable to Ms. Hill, the record reflects that Ms. Brooks could assign an employee to work the drive-through regardless of what the written schedule indicated. Therefore, a genuine issue of material fact exists as to whether Ms. Hill actually worked the drive-through more than other employees after October 6, 2014.

Finally, Ms. Hill's last alleged adverse action is BB&T's hostile work environment.[1] The Eleventh Circuit has not decided whether a hostile work environment claim is cognizable under the ADA, but the Court has noted other circuits have recognized it. *See Cooper v. CLP Corp.,* No. 16-10536, 2017 WL 548986, at *1 n.2 (11th Cir. Feb. 9, 2017). BB&T does not argue that such a claim is not cognizable, and so the court will follow the lead of the district court in

---

[1] BB&T argues that Ms. Hill did not plead this theory in her complaint. A cursory review proves otherwise. *See*, *e.g.*, (Doc. 1 at ¶¶ 61, 65) ("[C]oworkers or supervisors . . . treated her medical need as an opportunity to humiliate, alienate, and make fun of her . . . Brooks, Norred, and Norman discussed her medical diagnosis and publically ridiculed her for her disability . . . ").

*Cooper* and assume that a hostile work environment claim is actionable under the ADA. Accordingly, the court finds that a hostile work environment could constitute an adverse action.

Unlike other disparate treatment claims that address "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire, a hostile work environment claim addresses acts different in kind whose very nature involves repeated conduct, such as discriminatory intimidation, ridicule, and insult." *McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008) (internal quotations omitted).

To prevail on a disparate treatment claim using a hostile work environment theory, Ms. Hill must show that she was subject to unwelcome harassment that was so severe that it altered the conditions of her employment and created an abusive environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). In judging severity, the court considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. at 23.

Ms. Hill claims Ms. Brooks gossiped to employees at the Oxford branch and other branches about her diarrhea, and that when she walked into a room people would sneer at her. However, office gossip does not make a hostile work environment. *See Harris*, 510 U.S. at 23.

Ms. Hill also alleges that, on multiple occasions, employees at the branch intentionally delayed relieving her in the drive-through when she needed a restroom break. Unquestionably, if true, such conduct is unkind. However, it does not rise to the level of creating a hostile work environment given the facts of this case. Although an inconvenience, the record does not reflect that the action unreasonably interfered with Ms. Hill's performance. Ms. Hill was never disciplined when she left the drive-through unattended to use the restroom. Ignoring her requests

for drive-through coverage did not physically threaten or humiliate Ms. Hill, nor did it unreasonably interfere with her work.[2] Therefore, the court finds that the record does not evidence conduct sufficient enough to rise to the level of a hostile work environment.

        *b.*     *Causation*

Having identified three adverse actions—disproportionate assignment to the drive-through, failure to receive promotion, and termination—the court now considers whether evidence in the record presents a question of fact on the link between these actions and Ms. Hill's condition. Put simply, did BB&T undertake these actions *because* of Ms. Hill's disability?

Ms. Hill may establish causation for the purpose of summary judgment by use of a similarly-situated comparator. A comparator is similarly situated if the employee is "involved in or accused of the same or similar conduct" but "disciplined in different ways" from the plaintiff. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

In response to BB&T's motion for summary judgment, Ms. Hill suggests a number of comparators she claims establish a prima facie case that BB&T discriminated against her because of her disability. The first two are Mark Wallace and Belinda Reynolds, tellers at the Oxford branch. Ms. Hill claims that Mr. Wallace and Ms. Reynolds violated BB&T policies that posed a much larger risk to the bank than Ms. Hill's violation, yet were not terminated. Ms. Hill points to evidence that Mr. Wallace cashed a fraudulent check and Ms. Brooks violated the bank's cash swapping policy. Ms. Hill's third comparator is Ms. Norred, who allegedly maintained a balance in her cash drawer that exceeded the bank's limit by $20,000.

However, none of the comparators force balanced.[3] Ms. Hill argues that BB&T's failure to terminate these employees creates the inference that Ms. Hill's comparable violation was not

---

[2] This point is further elaborated in the discussion of Ms. Hill's failure to accommodate claim.

sufficiently serious to warrant termination. But Ms. Hill's conduct and that of the proposed comparators is too dissimilar. BB&T had a policy of terminating employees for force balancing. Ms. Hill's argument ultimately attempts to question that policy, as the only other employee in the record who forced balanced was terminated as well. The court cannot second guess BB&T's business judgment to consider force balancing an offense warranting termination. *Wascura v. City of S. Miami*, 257 F.3d 1238, 1247 (11th Cir. 2001) ("We are not in the business of adjudging whether employment decisions are prudent or fair."). Therefore, the court finds that the comparators suggested by Ms. Hill are not similarly situated.

Ms. Hill can also "survive summary judgment if [she] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Such an issue exists when "a convincing mosaic of circumstantial evidence . . . would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (internal quotations omitted). However, inferences must be reasonable and not sheer speculation. *See id.* at 1328 n.25 ("[A]n inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact . . .") (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999)).

In her brief, Ms. Hill recites the relevant case law on how a plaintiff may establish a "convincing mosaic," but does not explain what facts would compose it in this case. The court cannot construct the picture for her. *See Murphree v. Colvin*, No. CV-12-BE-1888-M, 2015 WL 631185, at *8 (N.D. Ala. Feb. 13, 2015) ("To the extent Murphree relies on a mosaic of discrimination theory, he must present the tiles and create the mosaic instead of expecting the

---

[3] Ms. Hill argues Ms. Reynolds force balanced on two separate occasions. While Ms. Reynolds did incorrectly report the amount of money in her drawer, she did not force balance. Force balancing occurs when a teller knows the count is off but "forces" the drawer to show a $0 balance. Because no evidence shows Ms. Reynolds knew her balance was off when she reported, she did not force balance. *See* (Doc. 25-11 at 94:1-94:10; 112:22-113:2).

court to piece it together for him."); *see also King v. ST Aerospace Mobile, Inc.*, No. 12–CV–0360–WS–B, 2013 WL 2635926, at *18 (S.D. Ala. June 11, 2013) (noting that the court "does not bear the burden of discerning this evidence for [the plaintiff], and federal courts do not 'guess' at what a litigant might mean."). Therefore, the court finds that Ms. Hill has failed to present a convincing mosaic from which a jury could find that BB&T discriminated against her on the basis of her disability.

Because Ms. Hill has failed to show that a genuine issue of material fact exists concerning whether BB&T took an adverse employment action against her because of her disability, the court will grant the motion for summary judgment on the ADA disparate treatment claim.

**B.     ADA Failure to Accommodate**

In addition to her disparate treatment theories, Ms. Hill also alleges that BB&T failed to accommodate her reasonable request not to work the drive-through. Ms. Hill "bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows [her] to perform the job's essential functions." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255–56 (11th Cir. 2001). A plaintiff does not need to show that an employer failed to provide reasonable accommodations *because* she was disabled, but merely that the employer failed to provide reasonable accommodation.

Ms. Hill identifies two accommodations BB&T could have undertaken: not assigning her to the drive-through (either through promotion to a vacant position or being assigned only to lobby duties), or allowing her to take restroom breaks as often as needed while working the drive-through. Both of these accommodations are premised on Ms. Hill's need to have easy access to a restroom.

Ms. Hill argues that reassignment would be a reasonable accommodation because she could work in a position "where she could be more readily relieved" if she needed to use the restroom. (Doc. 30 at 32). However, the record does not show that she was unable to use the restroom as needed when working the drive-through. Ms. Hill left the drive-through unattended twice to use the restroom and was not disciplined or reprimanded. BB&T encouraged the drive-through to be attended but did not have a formal policy of requiring it to be attended. Notably, all of the warnings or instructions about leaving the drive-through unattended occurred *prior* to Ms. Hill's leave. Those events cannot be used to show that BB&T failed to accommodate Ms. Hill's disability when she returned to work.

In response to BB&T's motion for summary judgment, Ms. Hill argues in her brief that she "soiled herself at work because of the Defendant's failure to accommodate." (Doc. 30 at 34). But that is not what the record reflects. Ms. Hill's testimony was that she soiled herself *after going* to the restroom; she did not soil herself as a result of not having easy access to a restroom. On the contrary, Ms. Hill said the incident occurred during two very bad days where she had to use the restroom frequently. On that morning, blood was in her diarrhea when she went to the restroom and she was wearing white pants, resulting in her needing to go home to change. Again, Ms. Hill has failed to produce evidence that she would have been disciplined had she left the drive-through unattended to use the restroom as needed.

Because the record does not reveal a question of fact as to whether BB&T accommodated Ms. Hill's reasonable request, the court will grant the motion for summary judgment on the failure to accommodate claim.

### C.    FMLA Interference

Ms. Hill argues that BB&T interfered with her rights under the FMLA by coercing her to delay taking leave and then coercing her to return early. An employer violates the FMLA not

only when it refuses to authorize leave, but when it "discourag[es] an employee from using such leave." 29 C.F.R. § 825.220(b). Pressure to reduce leave time interferes with an employee's FMLA rights. *See Hurlbert v. St. Mary's Health Care Sys., Inc.,* 439 F.3d 1286, 1293 (11th Cir. 2006) ("To establish an interference claim, an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied.") (internal quotation omitted)*; see also L Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1134 (9th Cir. 2003) ("Tran pressured Liu to reduce her leave time, thus discouraging her from using her FMLA leave.").

Viewing the record in the light most favorable to Ms. Hill, Ms. Brooks pressured her to reduce her leave time. A genuine issue of material fact exists concerning whether Ms. Brooks' communications with Ms. Hill were designed to pressure her into taking less leave or were innocuously aimed at setting the branch's schedule. Such a dispute turns on credibility and should be decided by a jury.[4]

### D.     ADA and FMLA Retaliation

Retaliation claims are cognizable under both the ADA and the FMLA, and are analyzed under the same standard. *See Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007). To establish a prima facie case of retaliation, Ms. Hill must meet three elements: (1) she engaged in protected activity; (2) she was subject to an adverse employment outcome; and (3) there is some causal relation between the two events. *Olmstead v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998). The causation prong is construed broadly; "a plaintiff merely has to

---

4 Ms. Hill presents two additional theories on how BB&T interfered with her FMLA rights. First, Ms. Hill argues that BB&T interfered with her rights by not permitting her intermittent leave for restroom breaks to accommodate her condition. Second, Ms. Hill argues BB&T violated her right to privacy by disclosing confidential medical information. However, these theories were not alleged in the complaint, and so the court will not consider them now. Ms. Hill's FMLA claim will move forward on the theory that BB&T pressured her to delay and reduce her leave.

prove that the protected activity and the negative employment action are not completely unrelated." *E.E.O.C. v. Reichhold Chem., Inc.*, 988 F.2d 1564, 1571–72 (11th Cir. 1993).

If Ms. Hill is able to establish a prima facie case, the burden shifts to BB&T to "proffer a legitimate, non-retaliatory reason for the adverse employment action." *Olmsted*, 141 F.3d at 1460. If BB&T does that, then Ms. Hill must show a question of fact exists as to whether BB&T's proffered reason is pretextual. *See id.*

Ms. Hill engaged in protected activity by requesting accommodation for her disability and applying for FMLA leave. Further, as previously discussed, Ms. Hill suffered adverse employment outcomes: disproportional assignment to the drive-through, failure to be promoted, and termination. The court now considers whether Ms. Hill has provided evidence that these events were not completely unrelated to her protected activity.

In the light most favorable to Ms. Hill, the record shows that once she returned from leave, BB&T assigned Ms. Hill to work the drive-through more than other employees. "Very close" temporal proximity between protected activity and the adverse act on its own can satisfy the causation element. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). Here, such proximity exists: Ms. Hill's increased assignment to the drive-through began immediately when she returned from FMLA leave.

BB&T's legitimate, non-discriminatory reason for any increase in Ms. Hill's assignment to the drive-through duty is that Ms. Reynolds' son's death required employees to assume increased drive-through responsibilities. However, taking the evidence in the light most favorable to Ms. Hill, her assignment to the drive-through was disproportional to other employees. A question of fact exists concerning how often Ms. Hill worked the drive-through,

and that same question means that the court cannot conclude on summary judgment that BB&T's proffered reason is not pretextual.

The second adverse outcome is BB&T's failure to transfer Ms. Hill into a branch banker position for which she had already completed all the requisite training. Indeed, before her FMLA leave or request for accommodation, Ms. Craven said that Ms. Hill would be transferred into the position. After her surgery and subsequent events, that did not happen. That fact, coupled with the proximity of that action to Ms. Hill's request for accommodation, establishes for summary judgment purposes that she has satisfied her burden of showing that BB&T's failure to promote her is not wholly unrelated to her protected activity.

BB&T proffers that its reason for not promoting Ms. Hill was that it decided to hire a bilingual employee, a need at the Oxford branch. Ms. Hill has produced sufficient evidence to create a question of fact as to whether this reason was BB&T's true motivation. In the light most favorable to Ms. Hill, the Oxford branch had never employed a bilingual teller while Ms. Hill worked there. Further, Ms. Hill testified that Spanish-speaking customers rarely did business in the Oxford branch and that BB&T provided a hotline for customers who needed translation assistance. Taken together, these facts create a genuine issue as to whether BB&T's proffered reason is pretextual.

Finally, the court considers whether Ms. Hill's protected activity had a causal link to her termination. BB&T's proffered reason for terminating Ms. Hill is that she force balanced, which is a legitimate, non-discriminatory reason. Ms. Hill's efforts to establish that the reason is pretextual mirror her efforts to show that BB&T discriminated against her because of her disability. As the previous argument fails, so too does this one. Ms. Hill has not "demonstrate[d] weaknesses or implausibilities in the proffered legitimate reason so as to permit a rational jury to

conclude that the explanation given was not the real reason, or that the reason stated was insufficient to warrant the adverse action." *Rioux v. City of Atlanta,* 520 F.3d 1269, 1280 (11th Cir. 2008).

Therefore, the court will grant the motion for summary judgment on the retaliation claims as to Ms. Hill's termination theory but deny it as to the failure to promote and reassignment theories.

### E.      Invasion of Privacy

Under Alabama law, the tort of invasion of privacy based on public dissemination of private information consists of two elements: publication must be (1) highly offensive to a reasonable person, and (2) not of legitimate concern to the public. *See Ex parte Birmingham News, Inc.,* 778 So. 2d 814, 818 (Ala. 2000).

Ms. Hill claims BB&T invaded her privacy when supervisors discussed her condition with other employees and disclosed her private medical information to potential employers following her termination.

Viewing the record in the light most favorable to Ms. Hill, supervisors at BB&T gossiped about Ms. Hill's medical condition to other employees. BB&T's defense is that Ms. Hill herself told others about the condition and, therefore, disclosure of the information could not have been highly offensive to her.

To counter BB&T's defense, Ms. Hill cites to *Sorrells v. Lake Martin, Inc.,* No. 3:09CV710-MHT, 2011 WL 627049 (M.D. Ala. Feb. 11, 2011), noting that the court in that case denied summary judgment on an invasion of privacy claim regarding dissemination of private medical information even when the plaintiff had also shared the information himself. The court found:

> [A]n employee's statement that he has a health problem does not give an employer license to share with others any and all speculative and unfounded comments about the employee's private health if the speculative and unfounded comments are not in any way reasonably related to the health problem at issue and would subject the employee to mental suffering, shame, or humiliation.

*Id.* at *7.

*Sorrells* is inapposite because the employee in that case had not also shared the information with other employees. In *Sorrells*, an employee notified his employer he had diverticulitis and gave three weeks notice of his intent to resign. The employer persuaded him to stay on part-time. Later the employee's condition worsened and he required emergency surgery. A manger told other employees that the employee had AIDS, even though the employee did not. The employee had never told employees he had AIDS or even discussed his diverticulitis with other employees. The employer's argument for summary judgment was that disclosure of the employee's condition opened the door to discussion of his health.

In contrast, the comments and atmosphere Ms. Hill allege invaded her privacy are on topics she publically discussed, including the reason for her more frequent restroom breaks. The comments may have been uncouth and even demeaning, but they cannot be said to have invaded Ms. Hill's privacy.

Further, no evidence in the record supports Ms. Hill's assertion that BB&T informed prospective employers of her disability. In her affidavit in response to motion for summary judgment, Ms. Hill does claim that BB&T retaliated against her by telling other banks not to hire her because she force balanced. But that statement is insufficient to present a genuine issue of material fact on the invasion of privacy claim for two reasons.

First, Ms. Hill lacks personal knowledge of what BB&T told prospective employers. The affidavit does not state, for instance, that prospective employers told her BB&T informed them

of the reasons for her termination. Of course, that statement would be hearsay, but could be considered at summary judgment as it could be reducible to an admissible form at trial.

Second, and more crucially, it does not support the theory advanced by Ms. Hill in her briefing, mainly that BB&T invaded her privacy by disclosing *private medical information* to third-parties. Nothing in the record supports that claim.

Accordingly, the court will grant BB&T's motion for summary judgment as to Ms. Hill's invasion of privacy claim.

### F.     Intentional Infliction of Emotional Distress

Alabama law recognizes the tort of outrage. *Am. Rd. Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980). To constitute outrage, the defendant must intentionally inflict emotional distress "so severe that no reasonable person could be expected to endure it." *Id.* The defendant's conduct must be "extreme," meaning that it is "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Id.* "Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" are insufficient. *Id.* at 364─65. The Alabama Supreme Court has made clear that the "tort of outrage is a very limited cause of action that is available only in the most egregious circumstances." *Thomas v. BSE Indus. Contractors*, Inc., 624 So. 2d 1041, 1044 (Ala. 1993).

BB&T argues that Ms. Hill "has not met the extremely high burden required to bring an emotional distress claim before the jury." (Doc. 24 at 25). Ms. Hill counters that BB&T's conduct in permitting a hostile work environment, failing to accommodate her disability, and disclosure of her private medical information is sufficient to show that it engaged in conduct outside the bounds of civilized society.

The court disagrees. As previously discussed, the record does not show that BB&T failed to accommodate Ms. Hill's disability nor that it disclosed her private medical information, which leaves the hostile work environment as the sole potential foundation of Ms. Hill's outrage claim.

Outrage has a higher bar than a hostile work environment under civil rights law. The court has already found Ms. Hill has not met the lower threshold to maintain a claim for a hostile work environment. Accordingly, Ms. Hill cannot demonstrate a question of fact concerning whether BB&T's conduct was sufficiently egregious to constitute outrage under Alabama law. The court will grant BB&T's motion for summary judgment as to Ms. Hill's claim for intentional infliction of emotional distress.

## IV.   CONCLUSION

The court will enter a separate order consistent with this opinion granting BB&T's motion for summary judgment as to ADA disparate treatment, ADA failure to accommodate, invasion of privacy, and intentional infliction of emotional distress claims, but denying the motion as to the FMLA interference and retaliation claims.

**DONE** this 31st day of August, 2017.

_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE